Pratt agt. Stiles.

entitled cause is affirmed with costs; and the order appealed from in the second above entitled cause is affirmed without costs to either party, on the appeal.

---

# SUPREME COURT.

AVERY PRATT, respondent, agt. PHILANDER STILES and STEPHEN STILES, appellants.

Although the mortgagee has the legal title to personal property under a mortgage, and the law day has passed for the payment of the money specified in the mortgage, yet, until foreclosure or sale, the right of redemption exists in equity. And, if the mortgagee sells the property, he will be liable to refund the excess over the mortgage debt, to the mortgagor. But the bill to redeem must be brought within a reasonable time.

The facts in this case, as developed on the trial before the referee, present one where a private sale of the property was made under the mortgage by the mortgagee to a third person, and a tender by the mortgagor of the amount due after the law day had passed, and it was *held* by the referee, that the circumstances under which the sale was made rendered it void and of no effect, and the tender made by the mortgagor was held good.

The question of *costs* of the trial, &c., in such a case, is properly within the discretion of the referee.

Where the referee tried the cause upon the whole issues presented to him, and determined that the plaintiff was entitled to redeem, and ascertained and declared the amount he should pay, to fulfil such redemption, and decided that the plaintiff should recover the costs of the suit, and made, signed and delivered his report directing final judgment, *Held*, that this terminated the jurisdiction and powers of the referee.

And where, several days after such report, the plaintiff, on application to the court, obtained an order for the referee to take an account of the value of the use of the horses (property in the mortgage) by the defendants, upon which the referee heard evidence and made a second or supplemental report, *Held*, that such last order of reference was irregular.

The plaintiff not having made the offer on the trial of the issues, to have the referee take such account, there was no way in which the omission could be rectified, except by an application for a new trial, on the ground of newly discovered evidence, surprise or mistake:

*Monroe General Term, March,* 1859.

*Present,* T. R. STRONG, JOHNSON *and* SMITH, *Justices.*

*Principal facts found on the trial.*

THIS action was brought to redeem a mortgage of personal property executed by the plaintiff to one Lucas, and by him assigned to the defendant, Philander Stiles.

The mortgage is dated 1st of March, 1855; it transfers a span of bay horses with other property; and is conditioned, among other things, for the payment of $150, to the mortgagee, on the 1st of July, 1855, with one year's interest. It provides, that in case of non-payment at that time, the mortgagee may take possession of the mortgaged property, sell it, and apply the avails (after deducting expenses of sale and keeping) in payment of the debt; and that in case the mortgagee shall at any time deem himself insecure and unsafe, he may take possession of the property, sell it at public or private sale, previous to the time above mentioned for the payment of the debt, and apply the proceeds as aforesaid. And it contains a covenant by the mortgagor to pay any deficiency of debt, interest, costs and charges.

The plaintiff paid ten dollars on the mortgage about the 1st of July, 1855, but nothing more, previously to the tender hereinafter mentioned.

The plaintiff was a farmer; these horses were his only team; and he retained possession of them, until the defendants took them from him in December, 1856, as hereinafter stated. They were worth $250.

The mortgagee was a brother-in-law of the plaintiff, and, not liking to force him to pay, he sold the mortgage to the defendant, P. Stiles, November 12th, 1856. In about a week the plaintiff first learned that Stiles had bought the mortgage, and immediately went to see him.

In that interview, Stiles did not ask for immediate payment, on the contrary, he expressed a willingness to wait till the next January.

On Friday, the 12th of December, following, nothing else having passed between them, Stiles went to the plaintiff's

house, and said he had come for the horses, but consented to let them remain with the plaintiff on his promising to pay him *on Saturday night* of that week. The amount then due was about $165.

On Saturday the plaintiff got $170 in money. About two o'clock he met Stiles at Cheshire, told him he then had $100, and that if he would wait till he saw one Booth, who lived about a mile from there, he would pay him the whole. Stiles said he could not wait, and told plaintiff to come to his house that evening. Plaintiff then went to Booth's and got the rest of the money, and in the course of the day started to go to Stiles'· with the money to pay him, and, being told by Chamberlain that Stiles was at Canandaigua, did not go to his house. Chamberlain had left Canandaigua about 5 o'clock, and saw Stiles there shortly before he left. As the plaintiff was returning home about 8 o'clock, he met both defendants in the road with one of the horses, which they had taken from his premises in his absence. They demanded the other horse, which plaintiff was driving. Philander took the horse by the bit,· and told plaintiff he had not come as he agreed; plaintiff said he had started for Philander's house, and learned he was not at home, but at Canandaigua; and Philander said he had been to Canandaigua; but was at home from 5 o'clock till 8. The plaintiff had the money in his pocket, and told Philander it was all ready for him; Philander asked if it was paper money; plaintiff said it was, and asked if that was not good; Philander said it was, but he wanted the other horse. They all then drove to Chamberlain's house, and Chamberlain, at plaintiff's request, came out and told Philander that plaintiff proposed to pay him the money, and offered it to him, and Philander replied that he did not take rags, but that it was too late, and if it was gold he would not take it, as he had sold the horses to Stephen. He also said that if Pratt "had been over to his house with the specie at sundown, he would have been smart, but he was too late." The defendant refused the money, unharnessed the horse Pratt was driving, and took both horses away. After Stephen had got possession of the horses, Phi-

lander said to plaintiff that, if he would give up a certain suit which was then pending against Philander about some hay, he would take the money and give up the horses—but plaintiff replied he had nothing to do with the suit—and Philander then said he would not give up the horses.

On Monday the defendants again refused to take the money. On Tuesday, the plaintiff tendered to Philander, at the Bank of Canandaigua, $170 in specie, in payment of the mortgage and expenses, and demanded the horses, and offered to redeem them, which sum was sufficient, but the defendant refused to receive it, or permit the plaintiff to redeem. On the next day he made the same tender to both defendants, at Huntley's office, but they refused.

After this tender, plaintiff told the defendant he should deposit the money in the Bank of Canandaigua, and did so, and directed the bank to let the defendants have it when called for. It remained there till the bank suspended in September, 1857, when, to save it, a note was taken for it against one Jones.

The circumstances attending the sale from Philander Stiles to his brother, which the referee held collusive and void, were these. After the plaintiff met Philander at Cheshire, on Saturday, and told him he had $100, and requested him to wait till he could go to Booth's and get the balance, Philander went to Canandaigua, *took counsel*, and was advised that he had a right to take the horses and sell them. He did not return *till dark*, and about eight o'clock he went to Stephen's and *asked him* if he did not want to buy Pratt's horses at the sum due on the mortgage, $165 and some cents. He told Stephen that Pratt had agreed to bring them or the money at sundown, and he had not come, and *he was going* to take them. Stephen said he would take them, if Philander *would stand between him and all harm*. They went to Pratt's barn, and Stephen said he would take them, *that they were cheap enough* at that price—and he then took one of the horses—and afterwards took the other from Pratt, as before stated. Philander also said they were a cheap team, worth more than the mortgage, and, if Stephen

did not buy them, he would sell them to some one else. *Stephen paid nothing* for them that night. Some time afterwards (Stephen thinks it was the next Monday), he gave Philander his note for the horses, due in sixty days. That was torn up, and *in July,* 1857, he gave a new note, payable the next July. Philander said on the trial he had " disposed" of it, but in what way he disposed of it did not appear. Chamberlain testified that, when he asked Philander if he claimed to have taken the horses, he replied that if he had not he would, and he then *directed Stephen* to take them. Chamberlain's son testified to the same. After Stephen had taken the horses, Philander proposed, on certain conditions, to *call Stephen back, take the money,* and *give up the horses.* Huntley testified that when plaintiff made the tender at his office, Stephen did not say much, but Philander said to him, " I don't want the money, do you?" and witness did not hear Stephen's answer, it was so low. The Sunday after the horses were taken, Stephen told Booth, that *it was not for him to decide* whether to take the money offered by Pratt, *he had no authority* to do anything about it. In July, 1857, Philander took the horses to his own farm, and used them; and Stephen instructed the witness Doolittle to say to Philander, in case he spoke of their being poor, that they did not do anything only get the grain they ate. Philander took the team again, in December, 1857, and kept and used them till the time of the trial, in March, 1858.

On this state of facts, the referee held, that the plaintiff had a right to redeem; that the sale to Stephen was void; that the tender was sufficient; and that the defendants having unreasonably refused it, they should pay costs. On the coming in of his report, the court ordered that he take proofs, and report the value of the use of the horses since the commencement of the action. The referee found the value of the use to be 116 dollars and 25 cents.

From the judgment entered on the referee's reports, the defendants appeal to the general term.

SMITH & LAPHAM, *attorneys, and* J. C. SMITH, *counsel for respondent.*

I. Although a mortgagee of chattels acquires an absolute title to them *at law*, on a default of payment at the day, the mortgagor still has a right of redemption which a court of equity will enforce. (2 *Story's Eq. Jur.* 348, § 1031; *id. p.* 349, *note* 1, *and cases there cited; Charter* agt. *Stevens*, 3 *Den.* 33; *Hinman* agt. *Judson*, 13 *Barb.* 629; see also, *Dane* agt. *Mallory*, 16 *Barb.* 46, *op.* ALLEN, J. *p.* 50, *and op.* GRIDLEY, J., *on appeal, p.* 54.) He may redeem after the law day, at any time before his rights are foreclosed *by a sale*, on the part of the mortgagee. And reasonable previous *notice* of the sale to the mortgagor is indispensable. (*Hart* agt. *Ten Eyck*, 2 *Johns. Ch.* 62, *op.* KENT, Ch. 100, *and cases there cited.*) And the sale must be *bona fide.* (2 *Story's Eq. Jur.* 349, § 1031, *and cases cited in note* 2.)

II. The sale to Stephen Stiles was void.

1. The referee has found that it was collusive, and, therefore, void, and his decision on that point is conclusive, there being abundant evidence to sustain it.

2. There was no previous notice of the sale. It was made while the property was in the possession of the mortgagor.

3. The sale was private. The terms of the mortgage only authorized a *public* sale, in case of default in payment. It will be observed, that while the mortgage gave the mortgagee power to sell " at public or private sale," in case he should deem himself insecure and unsafe at any time before the day of payment, it gave only power "to sell " in case of default—the words " at public or private sale" being there omitted. The words " to sell," standing alone, should be construed to mean a public sale only, that being the *usual* mode of selling mortgaged or pledged property, and the only mode that will secure fair competition and prevent a sacrifice.

III. The tender found by the referee was sufficient; it extinguished the mortgage, and entitled the plaintiff to the relief asked in the complaint.

IV. The plaintiff is entitled to costs. Although the gener-

al rule is, that a party, filing a bill to redeem, cannot recover costs, there are several circumstances in this case which make it an exception to the rule.

1. The defendants refused the plaintiff's tender. If the plaintiff had brought his suit without first making a sufficient tender, a different rule would have applied. (*Slee* agt. *Manhattan Company*, 1 *Paige*, 48, *statement of facts*, 51, *op.* WALWORTH, Ch. 81; *and cases there cited; Brockway* agt. *Wells, id.* 617; *Vroom* agt. *Ditmas*, 4 *Paige*, 527; *Barton* agt. *May*, 3 *Sandf. Ch.* 450, 455–6.)

2. There was a fraudulent combination between the defendants, to deprive the plaintiff of his rights. (*Henry* agt. *Davis*, 7 *Johns. Ch.* 40.)

V. The allowance to the plaintiff, for the use of the horses, is proper.

1. It is objected, that this item is not claimed in the complaint. The suit was commenced 23d of December, a few days after the tender. No such claim existed at that time. The claim is for the use since the commencement of the suit. For that reason, the referee properly declined to consider it under the first order of reference; and on the coming in of his report under that order, by which it appeared that the defendants had inequitably appropriated to themselves the use of the plaintiff's horses, for a period of fifteen months, since the commencement of the suit, the court properly ordered the referee to take and state an account of the value of such use, and report it to the court. The manner in which the value of use was ascertained and allowed is, in all respects, equitable and regular. It is in accordance with the long established practice of courts of chancery, in similar suits, respecting real estate, where it is common to refer to a master to take an account of rents and profits *pendente lite*, with a view to charging them to the mortgagee. (*Vroom* agt. *Ditmas*, 4 *Paige*, 526, 536; *Barton* agt. *May*, 3 *Sandf. Ch.* 450, 456.)

VI. There was no error at the trial.

VII. The judgment is clearly equitable in all respects. The conduct of the defendants has been unfair and oppressive

throughout. The plaintiff does not get full compensation. He
loses the interest on the money in the bank. The defendants
get full pay on the mortgage. The use of the horses has been
worth to them all it costs them, by their own showing. They
lose nothing but the costs, which they have occasioned. The
judgment is not only equitable but salutary, and ought to be
affirmed.

FAUROT & CALLISTER, *attorneys, and* J. P. FAUROT, *counsel
for appellants.*

This case was tried before a referee, who made a report in
favor of the respondent, on the 2d of March, 1858. On the
12th of April following, plaintiff obtained an order for the ref-
eree to take account of the value of the use of the horses, and
on the 3d of May following made a supplemental report.

I. The referee erred in deciding that the sale of the horses
by the defendant, Philander Stiles, was collusive and void.

1. Both the defendants testify to the sale, and their testi-
mony is not contradicted. Theirs is the only testimony on
the subject, and there is no legal presumption of collusion or
fraud.

2. There could be no collusion between Philander and Ste-
phen Stiles in the sale, as the horses, by the *forfeiture* of the
conditions of the mortgage, had become absolutely the property
of Philander, and he had as much right to sell them as he had
any other property of his own. The sale of the chattel mort-
gage from Lucas to P. Stiles was equally as collusive and void
as the sale to Stephen. Lucas sold the mortgage to Philander
Stiles, because he wished to get rid of plaintiff; and the
horses were sold to Stephen, because plaintiff had put him off
from time to time. (*Langdon* agt. *Buel,* 9 *Wend.* 80; *Patchin*
agt. *Pierce,* 12 *id.* 61; *Charter* agt. *Stevens,* 3 *Den.* 33; *Ferger-
son* agt. *Lee,* 9 *Wend.* 258; *Dane* agt. *Mallory,* 16 *Bar.* 46.)

The referee should have granted a nonsuit on the grounds
of such sale.

II. The tender of the money to the defendants did not re-
invest the plaintiff with the title to the horses. It could not

have that effect had there been no sale to Stephen. (*Charter agt. Stevens*, 3 *Den.* 33; *Patchin* agt. *Pierce*, 12 *Wend.* 61.)

But did the tender avail the plaintiff? It was not kept good. The bank where the money was deposited failed in September, 1857, and the plaintiff and Mr. Montague took a note from the bank as security. Nor was the money brought into court, which is necessary to make a tender good. (*Kortright* agt. *Cady*, 23 *Barb.* 490; *and cases there cited.*)

III. If the plaintiff had any rights at all after the forfeiture (assuming there was no sale from Philander to Stephen, of the horses in question), it was a *mere equity*, and to be enforced in equity as such, and not as a legal right (*Dane* agt. *Mallory*, 16 *Barbour, in the opinion of Justice* ALLEN, *p.* 50); and if the plaintiff should be allowed to redeem, it would be upon the payment of the amount of the mortgage, interest, expenses and costs of this action. (1 *Paige*, 48; 1 *id.* 617; 4 *id.* 58; 4 *id.* 526; 5 *id.* 9; *Wetheral* agt. *Collins*, 3 *Mad.* 255; *Detillon* agt. *Gale*, 7 *Vesey*, 583; *Loftus* agt. *Swift*, 2 *Scho. & L.* 642, *Har.* agt. *Tebbut*, 1 *Jacob & Walk.* 197.)

IV. The American doctrine, in regard to chattel mortgages, bears some analogy to the rule at common law in its early day, in regard to land. That rule was, that if the mortgagor failed to redeem on the law day, the conditions of the mortgage became forfeited, and the mortgagor lost his lands. (2 *Story's Eq. Jur.* § 1004.)

And after that rule had become modified, so that the mortgagor was allowed to redeem, it was incumbent on him to pay all the costs, both his own and that of the mortgagee. (3 *Daniel's Chancery Pl. & Pr.* 1225; *id.* 1226.)

V. If the plaintiff could maintain an action to redeem, he could not be allowed for the use of the horses, while they were in the possession of the defendants. The defendants took possession of them by virtue of the chattel mortgage, and the plaintiff had neither the possession, nor the right to possession of the horses, and, therefore, could not be allowed for the use of them. (*Dane* agt. *Mallory*, 16 *Barb.* 46.)

VI. Again: It was error to charge the appellant, Stephen

Stiles, with their use, as he was not a mortgagee nor assignee. He had possession by virtue of the sale from Philander; and assuming, for the sake of the argument, that the sale to Stephen was fraudulent and void, then Philander Stiles alone was the only person who was responsible for their use.

.VII. But the respondent did not claim any compensation for the use of the horses, in his complaint. It was not insisted on at the trial, nor was it part of the issue agreed upon between the parties, to be referred to the said referee, and the order obtained by the respondent, to have the referee report the value of their use, was without authority and void; therefore, the objections taken to the testimony, as to the value of the use, on the grounds stated by defendants on the trial, were well taken.

VIII. A chattel mortgage transfers to the mortgagee the *whole* legal title to the thing mortgaged, subject only to be defeated by the *performance* of the condition. (*Butler* agt. *Miller*, 1 *Comstock's Rep.* 496, 497, 500.)

A mortgagee of personal property, upon the failure of the mortgagor to perform the condition of the mortgage, acquires an *absolute title* to the chattel. (8 *John. R.* 96; 7 *Cow. R.* 290; 2 *Wend.* 596; 9 *id.* 80; 12 *id.* 61; 1 *Hill*, 473.)

The legal title to personal chattels mortgaged becomes absolute in the mortgagee upon default, notwithstanding the mortgage contains a power of sale. (*Burdick* agt. *McNamee*, 2 *Den.* 170.)

In regard to plaintiff's attempt to show an extension of time to pay the mortgage, it was a *nudum pactum*. (12 *Wend.* 63.)

IX. The conversation between plaintiff and Chamberlain, allowed by the referee in the absence of defendant, in folios 55, 56, was improperly allowed.

X. The nonsuit should have been granted on the grounds stated.

XI. The referee erred in striking out the testimony of the witness, John Freer, and in sustaining plaintiff's objection, as to plaintiff's attempting to secrete the horses in question, be-

fore they were taken, in order to defraud defendants. The referee also erred in maintaining plaintiff's objection to defendants' offer to show plaintiff's attempt to conceal said horses.

ι XII. The order of reference orders the referee "to take proofs and account of the use of the horses mentioned in the complaint, since the defendants came in possession of them, and to report the value of such use."

By the court—E. DARWIN SMITH, Justice. The decision of the referee, that the mortgagor was entitled to redeem, was clearly right. Though the mortgagee has the legal title and the law day has passed for the payment of the money specified in the mortgage, yet, until foreclosure or sale, the right of redemption clearly exists in equity. If the mortgagee sells the property, he will be liable to refund the excess over the mortgage debt to the mortgagor. (3 *Denio*, 33; 13 *Barb.* 630; 2 *Story's Equity*, § 1031.)

But the bill to redeem must be brought within a reasonable time. (1 *Vesey*, 278; 2 *Johns. Ch.* 100.) No error, I think, was committed by the referee on the trial or decision of the cause. The question of costs was within his discretion, and I think it was rightly disposed of by him. The entire difficulty in the case, as now presented to the court, arises from the proceedings subsequent to the decision and report of the referee, upon the merits. The whole action and all the issues therein were referred to the referee for trial. He tried the cause upon the issues presented, and determined that the plaintiff was entitled to redeem, and ascertained and declared the amount he should pay to perfect such redemption, and decided that the plaintiff should recover the costs of the suit, and made and signed and delivered his report, directing final judgment. This terminated the jurisdiction and powers of the referee.

After he had so made and delivered his report, the plaintiff applied to the court, at special term, upon notice and upon an affidavit, simply setting out that the referee had made his report, and that it appeared, on the trial, that the defendants had had the possession and use of the horses named in the complaint,

since the action was commenced, that the referee had charged the plaintiff with interest on the mortgage debt, but had not allowed anything or provided any allowance for the use of the horses, and obtained an order referring it back to the referee, to take an account of the reasonable value of the use of the horses in question, from the time of the commencement of the action.

Such order was executed, and the case on this appeal contains the proceedings and evidence upon such reference. The referee made a second report, in pursuance of such order, and final judgment was entered up, upon his direction contained in the two reports, and in conformity therewith.

The appeal from the judgment necessarily brings up for review the whole proceedings before the referee, and everything which has entered into or formed part of the judgment. And the defendants' exceptions are sufficiently broad to cover all the questions relating to such proceedings.

The right to redeem personal property, as much as real estate, carries with it the right to have an account of the rents and profits of the mortgaged property while the mortgagee has been in possession, and pending the litigation up to the time of making the final decree. If this were not so, this right of redemption would, in most cases, prove a very barren right. The claim to redeem would be, in many cases, entirely defeated by a protracted litigation, if the law were otherwise. (17 New-York, 84.)

The right to have such an accounting, in respect to the rents and profits of the mortgaged premises or property, is incident to the right of redemption, and is part of the relief ordinarily given in such cases. It was within the scope of the duties of the referee to take such an accounting before the making the final decree. It was part of the proceedings pertaining to the trial of the main issues before him, and essential to enable the referee to do complete justice to the parties. If this case had been tried by one of the judges of this court at special term, I think, where the cause had so far proceeded that the judge was satisfied that the plaintiff was entitled to redeem, he would

have made an interlocutory order or decree to that effect, and referred it to a referee to take and state an account of the amount due the mortgagor upon the original indebtedness, and an account of the use and profits of the property since the mortgagee took possession thereof. On the coming in of the referee's report upon these matters, a final decree or judgment would have been ordered.

The difficulty in cases like the present, where the whole issues are referred to a referee, is to determine the manner in which he should proceed. In *Palmer* agt. *Palmer* (13 *How.* 363), we held that it was within the discretion of the referee, and within his powers in a case in principle like this, to determine how he would conduct the trial.

In that case, which was a case of partnership, I suggested that the referee might make a special or separate report upon the main issue before taking the account. In this case, when he had determined that the plaintiff was entitled to redeem, I think he might have announced it, and that it would have been proper practice for him to have done so, and then, upon proper notice to the parties, to have proceeded to take the account in regard to the use and profits of the horses, and report what was due plaintiff, and determine upon the whole account what was justly and equitably due to the defendants or to either of them upon such redemption, over and above a just allowance for the use of the horses. It does not appear that the referee was asked to take any such account. The plaintiff, I think, should have offered this proof, and, if the referee had refused to take it, it would have been a good ground of exception.

Not having made any such offer or request, and having gone through with the trial, and taken the referee's report upon the issues referred, I do not see any way in which the question can regularly be raised, except upon an application for a new trial. The report of the referee upon the whole case stands as the judgment of the court. It must be reviewed upon exceptions, like any decision of the court, at the circuit or special term, on the trial of a cause. The court, doubtless, had the power to set it aside for any irregularity, or to open the

case for retrial before the referee, on the ground of surprise, mistake or newly discovered evidence. This is the only mode in which the omission of the referee, to take the account of the use and value of the horses, can now be rectified. The order of the court, referring it back to the referee to take such an account, I think, was an irregularity. The whole case must be opened for retrial before the referee, upon a proper proceeding, on application to the court for that purpose. If the plaintiff seeks to remedy the omission of the referee to take an account of the profits, &c., before the making of his original report, I can see no warrant for the course of proceeding adopted in this case, and think that the judgment should be reversed, and all proceedings since the original report of the referee, made on the 29th of March, 1858, without prejudice to the rights of the plaintiff, to make such application to the court for relief as he may be advised. The question of costs should be also reserved, to be disposed of by the court upon any such application, if one is made.

Judgment reversed.

---

# SUPREME COURT.

## The People agt. Francis Didien.

The constitution declares that "no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment or indictment of a grand jury."

The defendant was indicted for the crime of arson in the *first* degree—charged with setting fire, in the nighttime, to an inhabited dwelling-house, the property of, &c., the penalty for which is death. On the trial, the proof established only the crime of arson in the *third* degree—the burning of the goods and furniture in the building, with intent to prejudice the insurance company.

The question was, whether, if the legislature had power to classify offences different in their nature, under one general head, and to designate them, however unlike, as different *degrees* of the *same* offence, they had power to deprive the